

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-16-00076-CV

IN THE INTEREST OF A.S.,
A CHILD

----------

FROM COUNTY COURT AT LAW NO. 1 OF PARKER COUNTY
TRIAL COURT NO. CIV-14-0716

----------

## MEMORANDUM OPINION[1]

----------

R.S., father of A.S., appeals the termination of his parental rights to A.S. In one point, he attacks the trial court's findings of both grounds under section 161.001(b)(1) and best interest under section 161.001(b)(2) of the Texas Family Code. We affirm.

----

[1]*See* Tex. R. App. P. 47.4.

## Background

On August 29, 2014, the Texas Department of Family and Protective Services (the Department) filed an "Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship." *See* Tex. Fam. Code Ann. § 262.104 (West Supp. 2015) ("Taking Possession of a Child in Emergency Without a Court Order"). A.S. was not yet a year old. In the "Affidavit in Support of Removal," the investigator requested relief based upon Mother's and Father's drug usage, concerns regarding domestic violence, and concerns regarding Mother's "propensity for violence."

On September 2, 2014, the trial court signed an ex parte "Order for Protection of a Child in an Emergency" and named the Department as A.S.'s temporary sole managing conservator. *See* Tex. Fam. Code Ann. § 262.106 (West Supp. 2015) ("Initial Hearing After Taking Possession of Child in Emergency Without Court Order"). After the adversarial hearing on September 11, 2014, the trial court retained its appointment of the Department as A.S.'s temporary managing conservator. *See* Tex. Fam. Code Ann. § 262.201 (West Supp. 2015). The trial court also ordered a home study of A.L. and L.L. L.L. was A.S.'s maternal aunt. By October 20, 2014, A.S. was placed in the home of A.L. and L.L. About a year later, on October 13, 2015, L.L. filed a "Petition in Intervention."

On February 25, 2016, the date of trial, Mother filed an "Affidavit of Voluntary Relinquishment of Parental Rights." Mother designated the

2

Department as the managing conservator of A.S. On the same date, after a bench trial, the trial court signed a judgment terminating both Mother's and Father's parental rights to A.S. Regarding Father, the trial court found five grounds under section 161.001(b)(1)—subsections (D) (endangering conditions or surroundings), (E) (endangering conduct), (N) (constructive abandonment), (O) (failure to comply with court-ordered services), and (P) (use of a controlled substance in a manner endangering the child)—and best interest under section 161.001(b)(2). *See* Tex. Fam. Code. Ann. §§ 161.001(b)(1)(D), (E), (N), (O), (P), (2) (West Supp. 2015). The trial court appointed the Department as A.S.'s permanent managing conservator and ordered the placement of A.S. with L.L. to continue until further order of the court. Only Father appealed.

## Evidence

### Father

Father testified he had been incarcerated in the Parker County Jail since April 18, 2015. Trial was on February 25, 2016. He was incarcerated for assaulting Mother.

Father explained that on the day that his daughter, A.S., was born at the hospital, he pushed Mother's head but denied yanking Mother's hair. Father admitted using K2 at the time of A.S.'s birth.

Father maintained that he had completed a parenting class and had provided a certificate of completion to the Department. He asserted that he had done some of his drug counseling. Father testified that he had started his

3

counseling and classes but that he had transportation and money problems. Father said then he was locked up in a state jail facility for eight months. Father testified he was now drug free and hoped to remain drug free in the future. Father stated he had attended some of his individual counseling but after he was incarcerated, doing services became more difficult. When asked if he loved his daughter, Father responded, "I love my daughter with all my heart."

Father was verbally combative when questioned. When the Department's counsel objected that Father was nonresponsive, Father responded, "[T]hey're going to take [A.S.] anyway, so, I mean, they can all kiss my ass." When the Department asked him if he had assaulted Mother again in April 2015, he answered, "I ain't answering your bullshit." When asked if he had multiple convictions for possession of controlled substances, he answered, "That doesn't have nothing to do with my kid, either." When asked if he had any other children, Father responded, "Keep my kids out of this." When the Department persisted, he simply answered that he had no other children. When Father nodded his head in response to one of counsel's questions, counsel said that she was sorry but insisted he verbally state his answers, Father responded, "You're not sorry. You're not sorry at all. . . . None of you are. Y'all will answer in heaven. You will be degraded, you know this, right? Y'all think you're right, you're wrong. You will be in hell, all of you." Moments later, he continued,

> All of you kidnapping people. I don't care what you call it. Put me in jail, I'm already there. What are you going to do, put me in seg, woo, you can all kiss my ass. My kid is my world. You think

4

kidnapping children from parents is okay? The legal way or the right way? Because there's not one the right way, neither one. You people have been in that woman's life for God knows how long causing problems. You've taken almost every baby she's had. Why? Because . . . you're nosy. You're worthless. You ain't got nothing else better to do but downgrade other people. That woman is a good mother. And y'all ruined that. Y'all take and ruin her reputation like you got a chance to ruin everybody else's and you're going to do it. [F] y'all. . . . Sorry, Your Honor.

Later on cross-examination, when asked if he remembered an earlier conversation he had with the attorney, Father responded, "Yeah, when I said [f] you? That's the same answer you're going to get." Father continued, "Why is it you look and smile all pretty when you're really ugly. Get off me." When counsel requested the court to instruct Father to answer her question, Father interjected, "I'm not answering her question, Your Honor. I object." At this point, the trial court suggested to counsel that she let him go. Counsel complied. As none of the other attorneys had any questions for Father, that ended his testimony.

Mother

Mother testified that she had chosen to sign an affidavit of relinquishment. She understood that the Department's plan was to place her child for adoption with the intervenors, who also had one of her other children. Mother said Father had assaulted her in the hospital room while A.S. was present. She testified that Father had grabbed her hair and had pushed her head. She testified that was not the first time Father had assaulted her and that there had been other assaults. She thought that Father had been using K2 and methamphetamines, and she asserted that there had been positive tests.

5

After the Department removed A.S., she said Father had gone to some counseling and had received some drug treatment. She said that after Father assaulted her again, his probation was revoked, and he went to jail. She acknowledged that Father had a pattern of assaulting her.

Mother did not think Father was a stable person to be around a child. When asked if Father was stable while doing drugs, she answered, "Nobody is stable while they're on drugs, no." Mother testified that the positive drug tests showed that Father was using drugs both before and after A.S.'s birth. She did not want Father around A.S. while he was on drugs.

Mother testified she was somewhat familiar with Father's criminal history. She was aware that he had convictions for possession of controlled substances. She was also aware of his assaults against her.

Mother admitted letting her twelve-year-old daughter, D.D., drive a car on a rural road, filming it, and posting it on Facebook. Mother said she was in the passenger seat, and another one of her children, L.D., was in the car.

When asked if she had any issues in her life, Mother answered, "Other than CPS being in my life I really don't." She acknowledged that CPS had been in her life off and on since about 2003. Mother acknowledged not having any of her children in her care. D.D.'s father had legal custody of her, but Mother was allowed to visit her. L.D. was eleven and lived with her grandparents, who had adopted her. N. lived with A.L. and L.L., and L.L. was the intervenor in this suit. Mother had relinquished her rights to both L.D. and N.

6

Mother testified that A.S. was removed in August 2014 and that Mr. D. moved in with her in March 2015. She acknowledged that Mr. D. was on parole but asserted that he was low risk. When asked how many children Mr. D. had, Mother answered, "Our four and two others." None of his children lived with him.

Mother testified that she was pregnant again and was expecting another child in five weeks. She became pregnant in July 2015, while this case was pending. This would be her fourth child with Mr. D. When asked why she was having another child under the circumstances, she answered, "God chose that. Would you have rather me chose abortion?" She acknowledged not using birth control with Mr. D.

Mother testified that she had acknowledged during her counseling that it was her fault that CPS took her children. She explained, "Neglectful supervision due to allowing myself to be beat in front of my children." She added, "And drug use." Mother acknowledged she had been treated for mental health issues, but she denied being bipolar and denied needing any medication. She explained that she was on methamphetamines and "wasn't right in the head." She admitted having been on prescription medications for mental health issues but said she did not like how the medications had made her feel. If they had been prescribed again, however, she said she would have taken them. She admitted, though, that if she told her counselors that there was not a problem, her counselors were not going to prescribe her any medications, and she asserted that she did not feel like she needed any medications. Mother acknowledged that her

7

psychological evaluation indicated that she had bipolar 1 disorder; post traumatic stress disorder; "amphetamine type substance disorder, severe"; and anxiolytic disorder, which she said meant drug use. She disagreed with the bipolar disorder diagnosis but agreed with the post traumatic stress disorder and anxiolytic disorder diagnoses.

### The Licensed Professional Counselor

Kristen McNeill was a licensed professional counselor for Lena Pope Counseling Services. She was familiar with Mother because she had a transfer session with her on December 7, 2015, and a second session with her on January 4, 2016.

McNeill testified Mother had a history of being physically abused by spouses and of using drugs since she was fourteen. McNeill acknowledged Mother had reported in her assessments that she had previous diagnoses that included bipolar, schizo-affective disorder, PTSD, borderline personality disorder, and major depressive disorder.

McNeill testified she was in the courtroom when Father testified and found his behavior in the courtroom alarming. She described Father's behavior as volatile, angry, and "maybe aggressive." McNeill agreed courtrooms were "typically a place of order and respect." McNeill agreed it was concerning that he would behave in that manner in a place where that behavior was not expected.

8

<u>The Conservatorship Worker</u>

Julie O'Brien was the conservatorship worker for the Department; she was the person who provided services to families and children. She was familiar with Mother, Father, A.S., A.L., and L.L. O'Brien became the caseworker on the case in July 2015.

She described A.S. as very bonded to A.L. and L.L.'s family, which included A.S.'s half-sister (N.), their son, their daughter-in-law, and their grandbaby. O'Brien testified that she had visited their home every month and had observed the family interacting. She described the family as loving and kind, and she said A.S. hugged her caregivers. O'Brien testified A.L. and L.L. were committed to keeping A.S. in their family, and the Department's plan was for A.L. and L.L. to adopt her.

O'Brien testified A.S. was receiving ECI[2] services for speech. She said A.S. was two now and talked really well. Occasionally, A.S. received breathing treatments for breathing issues.

O'Brien further testified she had been to Mother's home and did not have a problem with the actual physical environment. O'Brien had seen Mother and A.S. interact and stated that Mother loved A.S., showed fairly good parenting skills, and interacted well with A.S.

---

[2]Early Childhood Intervention.

9

O'Brien said Mother's parenting course was an eight-week/eight-session course. Mother went to a one-day class. After the incident with the twelve-year-old daughter driving the car, O'Brien thought Mother needed more parenting instruction. O'Brien testified that while discussing the driving incident with Mother, Mother indicated that her ten-year-old daughter had also driven the car. O'Brien said that she had seen the Facebook video, and during the video Mother stated that they were going thirty-five miles per hour. Also during the video, the twelve-year-old daughter took her hands off the steering wheel, but Mother did not instruct her daughter to keep her hands on the steering wheel. O'Brien said that she could see other cars passing them. O'Brien did not think a ten-year-old girl and a twelve-year-old girl were mature enough to drive a car on a public road, and she discussed her concerns with Mother, but Mother disagreed.

O'Brien testified that Father had taken a couple of substance abuse assessments, and the one he took during the FBSS[3] case recommended that he receive inpatient treatment. Father did not complete any inpatient treatment. Part of the temporary order was that if inpatient treatment was recommended, Father was to complete it. Father attended a one-day parenting class, but he did not complete the parenting course. O'Brien testified that in August 2015, she asked Father to take an oral swab, but Father refused after admitting using methamphetamines one week earlier. O'Brien said that Father had indicated that

[3]Family Based Safety Services.

10

he was not interested in re-engaging in services at that time but was interested in visiting A.S. As of the date of trial, Father had not visited A.S. in the preceding six months.

O'Brien testified she did not discuss the hospital assault with Father but did discuss the second alleged assault with him. She said Father "indicated that [Mother] had stayed out for a couple of days and hadn't come home. And that she came home one evening. And that she tried to kiss him and he pushed her. And she clawed at his face. And then she made up the rest of the marks on her." O'Brien said that Mother had been consistent and had not indicated that she had lied about the assault. Father had been charged with an assault.

O'Brien said that she had discussed with Mother how she had a pattern of consistently choosing men who had been to prison, who used drugs, and who did not take care of their children and how these choices were dangerous. O'Brien stated that Mr. D. had already moved in with Mother by the time O'Brien had taken the case. O'Brien explained that the Department decided against asking Mr. D. to work services because he had a significant criminal history, he had no relationship with A.S., he was not caring for or supporting any of his own children, and the Department's plan was not to return A.S. to Mother. O'Brien thought Mr. D. was on parole for burglary, and she asserted he had "many, many convictions."

O'Brien said that Mother tested positive on an oral swab on October 1, 2014, for amphetamines but not methamphetamines. A follow-up urinalysis on

11

October 9 came back negative. Mother had tested negative for methamphetamines throughout the case.

O'Brien testified that Father had not completed many of his goals. She did not know if he had made any attempt to work his services while in prison. She acknowledged making no effort to contact prison officials to find out. When asked if she had visited Father in prison, she responded, "Every time I've gone to visit he's been ineligible for visitation."

O'Brien said that Father contacted her twice. The first time he called her and said that he wanted to set up visits with A.S. but added that he did not want to do visits with Mother because Mother was abusive to him. In response to this request, O'Brien went to see him in August 2015, and she described him as polite, but he indicated that he did not think that he would engage in services. During their visit, Father admitted being in violation of probation and was concerned about that. After her meeting with Father, O'Brien set up bi-weekly visitations for him on Fridays; however, in September 2015 when she informed Father, he indicated that he was not sure he could do the visits and told her that he would get back to her, but he never did. O'Brien thought that Father first went to jail in March 2015 for the assault and either bonded out or was given probation. Thereafter, she thought he had been arrested for a probation violation in November 2015. Before his arrest in February or March 2015, Father made most of his visits with A.S. but had not completed any of his services.

12

A.S. had been in A.L. and L.L.'s home for a year—since about September 2014. O'Brien visited A.S. in their home monthly, so she had visited seven times. A.S.'s sister, N., was nine. O'Brien said that A.S. and N. had a "definite sister bond." There were also "sister days" when A.S. got together with her other sisters to do something fun. A.L. and L.L. had fully cooperated with the Department. Both A.L. and L.L. were employed. The Department's plan was to leave A.S. with A.L. and L.L. pending an adoption. O'Brien saw nothing about A.L. and L.L.'s home that caused her any concerns for A.S.'s safety.

Although Mother had not tested positive for drugs since October 2014, O'Brien said there were other concerns. The Department was concerned about Mother's mental health and her interpersonal relationships, which O'Brien described as volatile. O'Brien testified she was also concerned about Mother's emotional stability; she described Mother as being "always on a swing" and as crying, being really upset, or being very angry. O'Brien added that Mother had issues at work with other employees. O'Brien described Mother's relationship with her own mother as being one of two extremes, either they were really close or they were "at war" and were not talking to each other. O'Brien concluded, "And those types of relationships . . . set her up for . . . a relapse in the future."

<u>The Prospective Adoptive Parent</u>

L.L. testified that she had been married to A.L. for twenty-four years and had adult children. Both she and her husband were employed at a hospice and had been employed there for more than fifteen years. She said A.S. was doing

13

very well and was a normal child. L.L. and her husband's intent was to adopt A.S. A.S. had been in their home since September 2014. A.S. considered both L.L. and Mother as her mother and called both of them "Mom." L.L. testified that A.S. considered A.L. to be her father and called him "Paw-paw." L.L. said she loved A.S. and provided for all her financial, educational, and social needs. L.L. planned to keep A.S. in ECI to help A.S. with her speech. A.S. had her own room at their house, and she went to daycare while they worked. A.S. was currently on health insurance provided by the Department, but once L.L. and A.L. adopted her, they would provide her with health insurance.

## Father's Complaint

In a single point, Father contends that the evidence is legally and factually insufficient to support the trial court's findings on the five termination grounds and the finding of best interest. Father argues that the focus of the trial was on Mother and that, because he was incarcerated, he was not the person making the decisions regarding A.S.'s care. Father maintains that Mother had admitted fault for the episodes of domestic violence. He stresses that there was no evidence that he had used drugs around A.S. He asserts that his inability to complete his service plan was the fault of his incarceration.

## Request for Findings of Fact and Conclusions of Law

Within his brief, Father also notes and complains that he had filed a request for findings of fact and conclusions of law and that the trial court had failed to file any findings or conclusions. In the context of accelerated appeals,

14

which an appeal of a termination decree is, whether the trial court files findings and conclusions is discretionary. *See* Tex. R. App. P. 28.1(c); *In re M.P.*, No. 02-14-00032-CV, 2014 WL 3882179, at *2 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (mem. op.). Additionally, in the context of termination appeals, the failure to file findings and conclusions is harmless when the termination decree sets out, as here, the termination grounds and best interest and where the record allows the appellant the opportunity to fully brief the sufficiency of the evidence. *See M.P.*, 2014 WL 3882179, at *3. Finally, Father failed to file a "Notice of Past Due Findings of Fact and Conclusions of Law" as required by rule 297 of the rules of civil procedure, so any complaint regarding the trial court's failure to make findings and conclusions was not preserved. *See* Tex. R. Civ. P. 297; *Burns v. Burns*, 116 S.W.3d 916, 921–22 (Tex. App.—Dallas 2003, no pet.).

## Standard of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe

15

involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001(b), § 161.206(a) (West 2014); *E.N.C.*, 384 S.W.3d at 802. "[C]onjecture is not enough." *E.N.C.*, 384 S.W.3d at 810. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the party seeking termination must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(b)(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b); *E.N.C.,* 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsections (D), (E), (N), (O), or (P) of section 161.001(b)(1) and whether the termination of the parent-child relationship would be in the best interest of the child under section 161.001(b)(2). Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

If the evidence is factually sufficient, then it is necessarily legally sufficient as well. *See In re M.V.G.*, 440 S.W.3d 54, 60 (Tex. App.—Waco 2010, no pet.); *In re J.E.H.*, No. 02-07-00137-CV, 2008 WL 467332, at *4 (Tex. App.—Fort Worth Feb. 21, 2008, no pet.) (mem. op.); *In re D.S.A.*, 113 S.W.3d 567, 569 (Tex. App.—Amarillo 2003, no pet.). Therefore, although Father's point encompasses both the legal and factual sufficiency of the evidence, we will address his factual sufficiency challenge first. If factually sufficient evidence

17

supports the trial court's findings, then the evidence is necessarily legally sufficient to support them.

## Grounds under Section 161.001(b)(1)(E)

The trial court found that Father had engaged in conduct or had knowingly placed A.S. with persons who had engaged in conduct that had endangered her physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). Section 161.001(b)(1)(E) requires courts to look at the parent's conduct alone, including actions or omissions or failures to act. *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). "Endanger" under section 161.001(b)(1)(E) means to expose to loss or injury or to jeopardize. *Id.* It means more than a threat of "metaphysical injury." *Id.* It is not necessary that the conduct be directed at the child or that the child actually suffer injury. *Id.* There must, however, be evidence of endangerment to the child's physical or emotional well-being as the direct result of the parent's conduct. *Id.* Additionally, termination under section 161.001(b)(1)(E) must be based on more than a single act or omission. *Id.* Section 161.001(b)(1)(E) requires a voluntary, deliberate, and conscious "course of conduct" by the parent. *Id.*

Father argues that the Department cannot show a course of conduct and asserts that his only act of questionable conduct while A.S. was present was his alleged assault of Mother in the hospital. We agree that there was evidence showing that Father had assaulted Mother in the hospital after A.S. was born and while A.S. was present. We disagree that this was the only evidence. Violent or

18

abusive conduct directed at the other parent or other people, even if it is not committed in the child's presence, may also be sufficient to show a course of conduct under section 161.001(b)(1)(E). *See In re D.C.*, No. 01-11-00387-CV, 2012 WL 682289, at *10 (Tex. App.—Houston [1st Dist.] Mar. 1, 2012, pet. denied) (mem. op.); *In re B.J.B.*, 546 S.W.2d 674, 677 (Tex. Civ. App.— Texarkana 1977, writ ref'd n.r.e.) ("[T]he father's demonstrated want of self control and propensity for aggression and vicious, cruel, brutal violence against [the mother] who did not conform to his will projected a threat that might reasonably be construed as endangering the physical well-being of children . . . .").

Mother testified that the assault in the hospital was not the first time Father had assaulted her and that there had been others assaults. The evidence also showed that Father assaulted Mother again later. O'Brien, the caseworker, testified that Father had told her that Mother was the aggressor in the dispute, but the trial court was not required to believe Father's version of the events. *See In re M.A.B.*, No. 01-15-00388-CV, 2015 WL 6081937, at *12 (Tex. App.— Houston [1st Dist.] Oct. 15, 2015, no pet.) (mem. op.); *Rochelle v. Dep't of Fam. & Prot. Servs.*, Nos. 01-05-00311-CV, 01-05-00312-CV, 2006 WL 305002, at *6 (Tex. App.—Houston [1st Dist.] Feb. 9, 2006, no pet.) (mem. op.). Father's behavior in court, while on the record and while in front of the trial judge, was verbally abusive. Abusive and violent conduct by a parent can produce an environment that endangers the well-being of a child and thereby can meet a

statutory ground for termination. *See In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.). Because Father felt free to express himself in this manner in the courtroom, the finder of fact could reasonably conclude that Father would behave in a like manner elsewhere.

Endangerment includes conduct that subjects a child to a life of uncertainty and instability. *See id.* A history of substance abuse and criminal misconduct clearly shows an endangering course of conduct that poses both a physical and an emotional danger to a child's well-being. *See In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). Mother thought Father used K2 and methamphetamines. She thought Father was using drugs both before and after A.S.'s birth. Mother said Father had convictions for possession of controlled substances. Father admitted using K2 on the day of A.S.'s birth. O'Brien said Father had admitted using methamphetamines in August 2015. Mother said no one was stable while on drugs and added that she did not want Father around A.S. while he was on drugs.

Father was also incarcerated twice while this case was pending. Evidence of criminal conduct, convictions, and incarceration and its effect on a parent's life and ability to parent may establish an endangering course of conduct. *See S.M.*, 389 S.W.3d at 492. Subjecting a child to the probability that she will be left alone because her parent is in jail endangers the child's physical and emotional well-being. *See id.*

Based on the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that Father had engaged in conduct or had knowingly placed A.S. with persons who had engaged in conduct that had endangered her physical or emotional well-being. *See C.H.*, 89 S.W.3d at 28. Because we hold that the evidence is factually sufficient, the evidence is necessarily legally sufficient. *See M.V.G.*, 440 S.W.3d at 60.

When we find that one of the alleged predicate grounds for termination under section 161.001(b)(1) is supported by sufficient evidence, it is not necessary to review the remaining predicate grounds. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.— Texarkana 2007), *pet. denied*, 260 S.W.3d 463 (Tex. 2008). Accordingly, we do not have to address whether the evidence was sufficient to support the grounds under subsections 161.001(b)(1)(D), (N), (O), or (P). For purposes of termination, one ground is sufficient. *See In re A.O.*, No. 02-09-00005-CV, 2009 WL 1815780, at *6 (Tex. App.—Fort Worth June 25, 2009, no pet.) (mem. op.).

We overrule the termination grounds' portion of Father's point.

### Best Interest

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground and best interest. *Id.* at 249; *C.H.*, 89 S.W.3d

21

at 28.  Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include the following:

(A)	the desires of the child;

(B)	the emotional and physical needs of the child now and in the future;

(C)	the emotional and physical danger to the child now and in the future;

(D)	the parental abilities of the individuals seeking custody;

(E)	the programs available to assist these individuals to promote the best interest of the child;

(F)	the plans for the child by these individuals or by the agency seeking custody;

(G)	the stability of the home or proposed placement;

(H)	the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)	any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may be inapplicable to some cases.  *C.H.*, 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.  *Id.*  On the other hand, the presence of scant evidence relevant to each factor will not support such a

finding.  *Id.*  That is, "[a] lack of evidence does not constitute clear and convincing evidence."  *E.N.C.*, 384 S.W.3d at 808.

### The Desires of the Child

The evidence showed that A.S. did not even identify Father as her father. Father had not visited A.S. in the six months preceding trial.  O'Brien testified that A.S. had bonded to A.L. and L.L. and their family.  This factor weighs in favor of terminating Father's parental rights.

### The Emotional and Physical Needs of the Child Now and in the Future

Father had not shown that he was able to meet either A.S.'s emotional or physical needs.  Father had been incarcerated in the Parker County Jail for the ten months preceding trial.  Father was simply unavailable.  This factor favors the termination of Father's parental rights.

### The Emotional and Physical Danger to the Child Now and in the Future

Regarding the emotional and physical danger to A.S. now and in the future, Father was physically abusive to Mother.  In a courtroom, where we would expect a person to be on their best behavior, Father was verbally abusive. Father displayed a volatile temperament that other evidence showed could escalate to physical violence against a person whom he supposedly cared for or, at the very least, against a person whom the child cared for—Mother.  As explained in our discussion of Father's course of conduct above, his behavior was endangering even if it was not directed at A.S. and even if A.S. was not present when it occurred.  *See B.J.B.,* 546 S.W.2d at 677 (stating that even

assuming the children did not see their father murder their mother, the murder upset the children, caused the children to have anxiety around men who resembled their father or who wore their hair or glasses like their father, and terrified them at the thought of having to live in the same house as their mother was killed in). Father never acknowledged any problem with his temperament, and to the extent that he saw drugs as an impediment to parenting and asserted that he hoped to remain drug free in the future, the trial judge, as the finder of fact, was not required to believe him. *See M.A.B.*, 2015 WL 6081937, at *12; *Rochelle*, 2006 WL 305002, at *6. This factor weighs in favor of termination being in A.S.'s best interest.

The Parental Abilities of the Individuals Seeking Custody

Regarding Father's parental abilities, Father did not present any evidence of any parental abilities. His volatile temperament and drug usage made him a poor fit for parenting any child. In contrast, O'Brien described A.L. and L.L.'s family as loving and kind. A.L. and L.L. had a stable marriage and stable jobs. They provided for A.S.'s financial, educational, and social needs. This factor weighs in favor of termination.

The Programs Available to Assist the Individuals to Promote the Best Interest of the Child

Father's attempts to work services designed to assist him was minimal. His attitude toward the Department, which attempted to set up his services, was hostile. On the other hand, O'Brien described A.L. and L.L. as fully cooperating

24

with the Department. L.L. planned on keeping A.S. in ECI to help her with her speech. This factor weighs in favor of terminating Father's parental rights.

The Plans for the Child by the Individuals or by the Agency Seeking Custody

Father appears to have been relying on Mother to care for A.S., but Mother relinquished her rights. Even if she had not relinquished her rights, Mother was living with a man with a history of criminal conduct and drug abuse and who, although he had his own children, was not taking care of any of them.

The Department's plan was to leave A.S. with A.L. and L.L. and for A.L. and L.L. to adopt her. A.L. and L.L. wanted to adopt A.S. A.L. and L.L. were able to meet A.S.'s financial, educational, and social needs. This factor weighs in favor of termination.

The Acts or Omissions of the Parent that May Indicate that the Existing Parent-Child Relationship is not a Proper One

Any Excuse for the Acts or Omissions of the Parent

Father was outraged at the conduct of the Department and thought its intervention was unwarranted. Father saw nothing in his conduct or in Mother's conduct that warranted any concern for A.S. The record was, however, replete with concerns about domestic violence, drug use, Mother's mental health, and Mother's living with Mr. D. These two factors favor termination.

Conclusion on Best Interest

Based on the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship

25

between Father and A.S. would be in the best interest of the A.S. *See C.H.*, 89 S.W.3d at 28. Because we hold that the evidence is factually sufficient, the evidence is necessarily legally sufficient. *See M.V.G.*, 440 S.W.3d at 60; *see also Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding evidence legally sufficient when most of best-interest factors weighed in favor of termination). We overrule the best-interest portion of Father's point.

## Conclusion

Having overruled Father's sole point on both termination grounds and best interest, we affirm the trial court's judgment.

/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DELIVERED: June 16, 2016

26